IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN SCOTT DUNLAP,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　CASE NO. 5:21-CV-136
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　　)　　JUDGE DONALD C. NUGENT
　　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　MAGISTRATE JUDGE
　　　　　　　　　　　　　　　　　　　)　　JONATHAN D. GREENBERG
　　　　　　　　　　　　　　　　　　　)
COMMISSIONER OF SOCIAL　　　　　　　)
SECURITY,　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　　)　　**REPORT & RECOMMENDATION**

Plaintiff, Kevin Dunlap ("Plaintiff" or "Dunlap"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period

of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In October 2018, Dunlap filed applications for POD, DIB, and SSI, alleging a disability onset date

of October 31, 2017 and claiming he was disabled due to anxiety, depression, severe knee pain, diabetes,

sleep apnea, asthma, and high blood pressure.  Transcript ("Tr.") at 218, 225, 250.  The applications were

denied initially and upon reconsideration, and Dunlap requested a hearing before an administrative law

judge ("ALJ").  Tr. 165.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On March 13, 2020, an ALJ held a hearing, during which Dunlap, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 34-77.  On March 31, 2020, the ALJ issued a written decision finding that Dunlap was not disabled.  Tr. 15-27.  The ALJ's decision became final on November 17, 2020, when the Appeals Council declined further review.  Tr. 1-3.

On January 18, 2021, Dunlap filed his Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 15, 18, 19.  Dunlap asserts the following assignments of error:

(1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

(2)  The ALJ committed harmful error forming the RFC when he failed to properly evaluate the evidence documenting Dunlap's severe impairments and failed to make a proper determination at Step Three of the Sequential Evaluation.

Doc. No. 15, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Dunlap was born in 1980 and was 37 years old on his alleged disability onset date.  Tr. 26.  He has at least a high school education and is able to communicate in English.  Tr. 26.  He has past work as a telephone operator, garbage collector driver, and electronic equipment repairer.  Tr. 25.

### B.    Relevant Medical Evidence[2]

**Physical impairments**.  On October 19, 2017, Dunlap visited his doctor's office for a follow-up appointment for his anxiety.  Tr. 487.  He reported that he had to resign from work due to crippling anxiety.  Tr. 487.  He explained that he ruptured a quadricep in 2014 while falling down stairs at work and that he had a fear of falling down stairs.  Tr. 487.  He stated that he had had six surgeries to address

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

his injury and had contracted multiple infections, including MSRA (Methicillin-resistant Staphylococcus aureus), after his surgeries.  Tr. 487.  Upon exam, he had a normal gait.  Tr. 488.

On December 28, 2017, Dunlap saw Dr. Toni King for a follow-up for his type 2 diabetes.  Tr. 436.  Upon a musculoskeletal exam he had no edema and a normal gait.  Tr. 438.  He was assessed with type 2 diabetes with hyperglycemia and polyneuropathy, hypertension, and severe obesity.  Tr. 439-440.  Dr. King stated that he had improved control of his diabetes and adjusted his medications.  Tr. 439.   His Hemoglobin A1c test came back abnormal, at 9.1.  Tr. 445.

On May 10, 2018, Dunlap saw Dr. King for a follow-up.  Tr. 447.  His Hemoglobin A1c had improved to 6.8.  Tr. 447.  He was preparing for bariatric surgery and was pleased about his blood sugar level.  Tr. 447.  Dr. King assessed his diabetes as controlled and commented that he had a much better handle on it.  Tr. 450.

On November 28, 2018, Dunlap had gastric bypass surgery and was discharged from the hospital on November 30.  Tr. 522.

On December 11, 2018, Dunlap went to the emergency room reporting incisional drainage at his surgery site.  Tr. 604.  He was prescribed oral antibiotics.  Tr. 609.

On January 8, 2019, Dunlap had a follow-up appointment at his doctor's office and reported having lost 40 pounds.  Tr. 748.  He was walking three times a day and going to weekly counseling visits.  Tr. 748.  On March 4 and 12, he had a normal gait.  Tr. 755, 757.

On April 2, 2019, Dunlap went to his doctor's office for a follow-up and reported that he had recently fractured his 5th metatarsal and had an upcoming appointment with his surgeon.  Tr. 760.  He denied numbness or tingling.  Tr. 760.  His leg was splinted and wrapped.  Tr. 760.  On July 17, he reported that he had had surgery in April and was still wearing a boot.  Tr. 767.

On July 23, 2019, Dunlap saw Dr. Erika Glass at Spectrum Orthopaedics to have his right knee

3

evaluated.  Tr. 786.  He stated that his knee pain worsened when he kept it bent for a long period of time and with prolonged walking, prolonged standing, and descending stairs.  Tr. 786.  He recounted his prior right knee surgeries: four quadricep tendon rupture repairs and two arthroscopies to clean out the joint. Tr. 786.  Upon exam of his right knee, he had a normal pulse, mild to moderate tenderness, mild joint swelling, a mildly limited range of motion, normal sensation, and intact motor function.  Tr. 787.  He had a mildly antalgic gait and his remaining lower extremity joints were normal.  Tr. 787.  Dr. Glass assessed right knee osteoarthritis and recommended a knee gel injection and home exercises.  Tr. 789.

On September 28, 2019, Dunlap went to the emergency room complaining of left knee pain after he had hit his left knee while falling down the stairs after his right leg gave out.  Tr. 791.  An MRI showed a quadriceps tendon tear.  Tr. 795.  Dr. Glass performed surgery to repair the tendon on October 23.  Tr. 796-797.

On December 5, 2019, Dunlap had a follow-up with Dr. Glass; he stated that his left leg was doing ok but he was still having some pain in the tendon area.  Tr. 827.  Upon exam, his right lower extremities (hip, thigh, knee, ankle, foot) were normal (no tenderness, no swelling, normal range of motion, normal strength, tone and stability).  Tr. 828.  He had mild tenderness in his left knee and mild to moderate swelling in his joint.  Tr. 828.  His other left lower extremity joints were normal.  Tr. 828. Dr. Glass advised that he should start bending his knee and gave him home exercises.  Tr. 829.

On January 7, 2020, Dunlap returned to Dr. Glass for a follow up.  Tr. 833.  He ambulated without an assistive device and had a slight limp.  Tr. 833.  He reported sharp pain in his kneecap, he had been going to therapy and his flexibility had improved, and he rated his pain 6/10.  Tr. 833.  His left lower extremity exam findings were the same as his prior visit and he walked with a mild-moderate antalgic gait.  Tr. 834.

On February 27, 2020, chiropractor John Pinghero, D.C., completed a Physical Medical Source

4

Statement on Dunlap's behalf.  Tr. 955-958.  He stated that he had treated Dunlap since December 2017 and listed his diagnoses: quadricep muscle injuries, right knee arthritis, left foot fracture, depression and anxiety.  Tr. 955.  He listed Dunlap's symptoms as bilateral knee pain and opined that he could sit 30 minutes at a time and stand for 10 minutes at a time, no more than 2 hours total in a workday.  Tr. 956. When asked if Dunlap needed unscheduled breaks in a workday, Dr. Pinghero wrote, "No work capabilities."  Tr. 956.  Dunlap needed a cane at times due to imbalance, insecurity, pain, dizziness, and weakness.  Tr. 957.  He could never lift any weight and his symptoms would cause him to be off task more than 25% of a workday.  Tr. 958.  Dr. Pinghero could not estimate Dunlap's absenteeism percentage because Dunlap has no work capabilities and explained that Dunlap remained under orthopedic and psychiatric care, had not been released to work, and that vocational rehabilitation was an option once he reached medical stability.  Tr. 958.

**Mental Impairments**.  On October 19, 2017, Dunlap visited his doctor's office for a follow-up appointment for his anxiety.  Tr. 487.  He reported that he had to resign from work due to crippling anxiety, detailed his work injury from 2014, and stated that he had a fear of falling down stairs.  Tr. 487. He went to counseling twice a week.  Tr. 487.  Upon exam, he had indirect eye contact.  Tr. 488.

On December 28, 2017, Dunlap saw Dr. Toni King for a follow-up for his type 2 diabetes.  Tr. 436.  He endorsed depression and nervousness/anxiety.  Tr. 437.  Upon exam, his mood, memory, affect and judgment were normal.  Tr. 439.

On January 23, 2018, Dunlap saw Dr. Donald Weinstein for a psychological evaluation as part of his worker's compensation claim for work injuries from October 2014.  Tr. 638-643.  Dr. Weinstein diagnosed major depressive disorder single episode, moderate, and generalized anxiety disorder, caused by his 2014 injury.  Tr. 643.  He recommended psychotherapy and a psychotropic medication consultation.  Tr. 643.  He stated that Dunlap was unable to perform his job duties at that time because

he was anxious and depressed, had fatigue and poor sleep, and was irritable, socially withdrawn, and pessimistic, and that Dunlap should be able to return to work in July 2018.  Tr. 648.

On April 11, 2018, Dunlap started monthly psychotherapy treatment with Dr. Cheryl Benson-Blankenship in conjunction with his worker's compensation claim.  Tr. 665.  Dr. Benson-Blankenship assessed his functional impairments as "moderate" limitations is his activities of daily living, social functioning, concentration, persistence and pace, and adaption.  Tr. 665.

On June 19, 2018, Dunlap reported that his medication seemed to be working okay.  Tr. 465.

On October 10, 2018, Dr. Benson- Blankenship wrote that he had benefited from weekly counseling services at WeCare Counseling and she again assessed his functional limitations in the above domains as "moderate."  Tr. 679.

On October 16, 2018, Dunlap returned to his doctor's office for a follow up.  Tr. 457.  He had had a panic attack a few days ago due to a next-day appointment with Job and Family Services; the appointment was overwhelming, especially at the beginning.  Tr. 457.  His sleep was inconsistent and he reported fatigue.  Tr. 457.  On November 13, he reported that he had had no panic attacks for a few weeks but still had daily anxiety.  Tr. 456.  Counseling was "definitely helping."  Tr. 456.

On November 21, 2018, Dunlap's counselor at WeCare was given a Daily Activities Questionnaire to complete on Dunlap's behalf, but answered "N/A" for each question.  Tr. 517-519. The counselor completed a portion of a Mental Status Questionnaire and wrote that Dunlap was seen weekly and consistently attended scheduled appointments.  Tr. 513-515.

On January 8, 2019, Dunlap had a follow-up appointment at his doctor's office and reported that he had recently switched to a new medication and had had a recent panic attack.  Tr. 748.  On March 4, he reported that his recently added medication had not helped with his depression and anxiety and that no medication he had tried had worked.  Tr. 754.  On March 12, his anxiety was not improving and was

6

especially bad that day.  Tr. 756.  He felt physically and mentally "more ansty" and his anxiety was disabling and interfered with his ability to work.  Tr. 756.  Upon exam, he was anxious and worried and he described his mood as "pretty bad."  Tr. 757.

On March 13, 2019, Dunlap saw Dr. Bryan Krabbe for a consultative examination.  Tr. 631-637.  After an examination, Dr. Krabbe found that Dunlap's remote and recent memory were adequate and his attention and concentration were satisfactory.  Tr. 635.  He diagnosed unspecified depressive disorder and unspecified anxiety disorder.  Tr. 636.  He opined that Dunlap performed adequately on a task to assesses his ability to understand and remember instructions.  Tr. 636.  He functioned within adequate limits of intellectual functioning to interact with supervisors and adequately relate to coworkers, and displayed appropriate responses and affect during the exam but had reported symptoms of depression that "may compromise his ability to respond to work pressures leading to increased likelihood of agitation."  Tr. 637.

On July 17, 2019, Dunlap had a follow-up with his doctor and reported that he had weaned himself off venlafaxine and had started taking sertraline after seeing a psychiatrist.  Tr. 767.

On October 21, 2019, Dunlap had a diagnostic assessment at WeCare Counseling and an Individualized Service Plan issued.  Tr. 733-738, 739-740.  Goals listed were to reduce the overall frequency, intensity, and duration of his anxiety so that daily functioning was not impaired, to enhance his ability to effectively cope with the full variety of life's anxieties and return to an effective level of functioning, and to stabilize his anxiety level while increasing his ability to function on a daily basis.  Tr. 739-740.

On February 24, 2020, Dunlap reported that he had been off Zoloft for three months.  Tr. 950.  Upon exam, he was well-groomed, cooperative, had fair attention, intact memory, a normal mood, and a bright, full-ranging affect.  Tr. 950-952.  He was prescribed Cymbalta.  Tr. 951.

7

## C.    State Agency Reports

On February 2, 2019, Dr. Steve McKee opined that Dunlap could perform work at the light level of exertion with postural and environmental limitations.  Tr. 88-89.  On May 31, 2019, Dr. Elizabeth Das adopted Dr. McKee's opinion.  Tr. 120-121.

On March 18, 2019, Dr. Aracelis Rivera opined that Dunlap could understand simple and complex tasks but may have issues maintaining attention for long periods due to his mental health symptoms to complete complex tasks "and would therefore benefit from a sup[ervisor] to offer occasional redirection" and could complete tasks in a setting where there are no strict production quotas or frequent changes.  Tr. 90-91.  On June 5, 2019, Dr. Jennifer Swain adopted Dr. Rivera's opinion.  Tr. 121-122.

## D.    Hearing Testimony

During the March 13, 2020 hearing, Dunlap testified to the following:

- He lives in a 2-story house with his son and his girlfriend.  Tr. 40-41.  His bedroom and bathroom is on the second floor.  Tr. 41.  He usually traverses the stairs twice a day—when he gets up in the morning and when he goes to bed at night.  Tr. 41.  He has a medical urinal that he uses when he is downstairs but if he absolutely has to make the trip upstairs he does.  Tr. 41.  There is a basement but he doesn't go down often, maybe twice a week or month.  Tr. 42.

- He has an associate's degree in IT and a commercial driver's license.  Tr. 42.  He is able to drive but his girlfriend drove him to the hearing.  Tr. 41.  He drives short distances (about 20-25 minute trips) because it can be painful to sit too long.  Tr. 41.

- He last worked in 2017 answering calls at a call center.  Tr. 43-44.  When asked why he is unable to work, he cited his physical limitations and his depression, anxiety and PTSD.  Tr. 49.  He's been suffering panic attacks "to the point where like even just sitting in here, it's a little much."  Tr. 49.  Just to get out of bed in the morning was "exceptionally hard."  Tr. 49.  Sometimes he had difficulty maintaining his cleanliness.  Tr. 49.

- His depression has taken over his life and was caused by his work injury six years ago.  Tr. 50.  For treatment, he goes to counseling every week, he sees a psychiatrist, and he has tried several medications and was still going through them.  Tr. 50-51.  He has not found one medication that has worked.  Tr. 51.  Also, his medications cause side effects—he is either "exceptionally sleepy" or he can't sleep at all.  Tr. 51.  He can't turn his mind off, it's

constantly running, and he can't get to sleep or stay asleep. Tr. 51. He gets about two hours of sleep at night and he sometimes, but not often, takes naps during the day. Tr. 51. Lack of sleep causes problems with his energy level in the daytime. Tr. 51. He struggles with day-to-day things and his son helps him out a lot, doing dishes and laundry and taking care him. Tr. 51.

- He estimated that he had gained about 70 pounds after his 2014 injury and before his bariatric surgery. Tr. 52. He has diabetes, but since his surgery he has been able to stop taking his diabetes medication. Tr. 63. He still has neuropathy in his feet, which he used to take medication for, but it wasn't helping "excessively" so he switched to a topical oil that worked better. Tr. 63-64.

- When asked how long he was able to concentrate, he stated that he is struggling with that now. Tr. 52. He struggled to talk. Tr. 52. He never used to have problems speaking in public. Tr. 52. When asked if he has problems concentrating, he stated that he tends to gravitate from one thing to the next; for example, if he is watching a tv show he'll pick up his phone and get distracted by something else. Tr. 52. He can't focus on one thing at a time. Tr. 52. He sometimes has problems following conversations with others. Tr. 53. He will forget to pick something up at the store. Tr. 60. At times he has angry outbursts. Tr. 59.

- He used to be a lot more active and played sports, but now he just goes through the motions and does not want to do anything. Tr. 53. He has anxiety from developing MSRA after his surgery; they told him it was something he would always have to live with and he feared it would come back, he feared dying, and that causes panic attacks. Tr. 54. He gets panic attacks one to three times a day and they last for 20-60 minutes. Tr. 54. They are triggered by being alone with his thoughts and improved when someone is with him. Tr. 54. He also uses techniques that his providers taught him, which help depending on the severity of his attack. Tr. 59.

- Of all his physical problems, his knees are the most painful. Tr. 55. His pain ranged from 5/10-8/10; he takes pain medication if he has it or he drinks. Tr. 55. Nothing made it better and moving around, being "up active," and stairs made it worse. Tr. 55. At the hearing, "sitting here," his pain level was 5/10. Tr. 55. His reluctance to use stairs, walk on wet floors and ice in the winter was due to his fear of those surfaces, rather than his physical impairments. Tr. 56. Going down stairs and having his right leg give out is what caused his work injury in 2014 and also his more recent foot fracture. Tr. 56. He tends to use bathing wipes instead of taking a shower because he is afraid of slipping and falling. Tr. 56.

- Sitting too long hurts his knee joints because they get stiff when they are in the same position. Tr. 56. Occasionally he will lie down during the day; for example, if he goes upstairs during the day he tends to lie down before he returns downstairs. Tr. 57.

- When asked to describe a typical day, such as the day before, he stated that he woke up, took his medications, went to the restroom, then went downstairs. Tr. 57. He had a protein shake, sat on the couch, talked to his son, and hung out with him, watching tv. Tr. 57. Then

9

he drove to the grocery store, picked up what he needed (it took about 10 minutes) and returned home. Tr. 58. He didn't have any appointments that day so there wasn't much going on. Tr. 58. He had a snack, watched tv, played on his phone, ate again, let his dog out. Tr. 58. He doesn't really do any chores around the house, his son does them. Tr. 58.

- In addition to his sons, he sees his mother on a regular basis. Tr. 61. He doesn't see any friends on a regular basis because he did not grow up in the area. Tr. 61. When asked if he uses a cane, he stated that he uses it "depending on if I'm going to be standing somewhere for an extended period of time." Tr. 61. He could walk about 10-20 minutes and was able to walk from the parking garage to the hearing (10 minutes). Tr. 62. He could stand for about 25-30 minutes before having to sit down. Tr. 62. He was wearing a brace on his right leg. Tr. 63.

The VE testified that Dunlap had past work as telephone operator, garbage collector driver, and electronic equipment repairer. Tr. 67-68. The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Dunlap could perform his past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 68-71. The VE answered that such an individual could not perform Dunlap's past work but could perform the following representative jobs in the economy: call-out operator, document preparer, and account clerk. Tr. 72. When asked about absenteeism and off-task behavior, the VE stated that an individual could not be off-task more than 15% of the workday and could not miss more than one day of work a month. Tr. 72.

Dunlap's attorney asked the VE to confirm that an individual who could only sit for two hours could not perform sedentary work and the VE agreed. Tr. 74. The attorney asked whether an individual who needed occasional monitoring or redirection on an ongoing basis would be able to retain employment and the VE answered that such an individual would not remain employed. Tr. 74.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

10

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the

11

national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Dunlap was insured on the earliest possible disability onset date, October 31, 2017, and remained insured through December 31, 2020, his date last insured ("DLI").  Tr. 16.  Therefore, in order to be entitled to POD and DIB, he must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since October 31, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: Morbid obesity; Right knee arthritis status post arthroscopy; Degenerative joint disease of left knee; Bilateral quadriceps tendon ruptures; Degenerative joint disease of the left shoulder; Asthma and asthmatic bronchitis; Type 2 diabetes mellitus with hyperglycemia and polyneuropathy; Depressive disorder; Anxiety disorder; and Personality disorder. (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except Never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; Frequently reach with the left upper extremity; Avoid concentrated exposure to extreme cold, extreme heat, humidity, and pulmonary irritants such as fumes/odors/dusts/gases/poor ventilation, and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles; Can perform a wide range of simple and complex tasks, but cannot perform

tasks that require a high production rate pace such as assembly line work; and Can respond appropriately to occasional change in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February **, 1980 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18-27

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's

13

findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012

WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Dunlap's constitutional challenge fails

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a).[3] Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. Doc. No. 15, pp. 9, 26; Doc. No. 18, p. 4; *see also Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. --, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (*e.g.*, "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Dunlap's disability application. Dunlap argues that he is entitled to a remand for a new hearing and decision. Defendant disagrees, asserting that Dunlap must show that the unconstitutional removal restriction caused the denial of his benefits claim and that he does not make such a showing.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief

---

[3] https://www.ssa.gov/history/saul.html. Saul is no longer the Commissioner.

when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. 140 S. Ct. at 2208, 2211. In *Collins*, the Court took up that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to be entitled to relief. 141 S.Ct. at 1787-1789.

### 1. *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of mortgage financing. 141 S.Ct. at 1770. Pursuant to the statute creating the FHFA, the head of the agency was a Director removable by the President "only 'for cause.'" *Id*. Fannie Mae and Freddie Mac shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than shareholders. *Id*. They argued that the removal provision in the FHFA statute was unconstitutional because, by restricting the President's power to remove the FHFA Director, the statute the violated separation of powers. *Id*. at 1787. The Court agreed. *Id*. (citing *Seila Law*, 140 S. Ct. at 2205). But the Court did not provide the shareholders the remedy that they sought—that "the third amendment must be completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*." *Id*. But the Court noted that the third amendment was adopted by the FHFA's Acting Director, whose position did not have the improper removal restriction that the Director's position had had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed. *Id*. at 1783, 1787. Next, regarding the shareholders' argument with respect to the actions that Directors had taken to implement the third amendment, the Court reasoned,

16

All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could inflict compensable harm, and gave the following examples:

Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789. The Court remanded the case for consideration of the shareholder's suggestion that "the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholder." *Id*. at 1789.

### 2. Dunlap does not show compensable harm and is not entitled to a remand

Dunlap argues that the government deprived him of a "valid administrative process" because the ALJ who decided his case was "delegated" authority by then-Commissioner Saul, "which means that [the ALJ's] ability to make findings of fact and issue a final decision was constitutionally defective." Doc. No. 15, p. 10; Doc. No. 19, p. 4.[4] But the argument that Saul had no authority to carry out the functions of his office because the removal restriction was unconstitutional was rejected by the Court in *Collins*. 141 S.Ct. at 1788, n.23 ("[T]he unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office"). Because Saul had the

---

[4] Defendant asserts, and Dunlap does not dispute, that the ALJ who decided his case was not appointed by Saul, but by Saul's predecessor, then-Acting Commissioner Berryhill. Doc. No. 18, p. 5; Doc. No. 19, p. 5. Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not contain a "for cause" removal provision; and, thus, was not unconstitutional. *See Collins*, 141 S.Ct. at 1782.

authority to carry out the functions of his office, the ALJ who decided Dunlap's case while Saul was Commissioner cannot have issued a *per se* unconstitutional decision just because authority had been "delegated" to him by Saul.  *Id*.

Dunlap's additional arguments are without merit.  He contends, "The ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same. This means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim."  Doc. No. 15, p. 10.  His argument fails because, as stated above, the unconstitutional removal provision did not strip Saul of his authority to fulfill his obligations of office, including promulgating regulations.  His assertion that the Commissioner "also faced reduced constitutional checks and balances from the Courts" because the Commissioner's interpretation of Social Security regulations is given deference by the courts (Doc. No. 15, pp. 10-11) fails for the same reason.  Moreover, he does not identify what regulations Saul promulgated that the ALJ used to decide his case.  In short, he has not shown compensable harm of the type described by the Court in *Collins*.

In his reply brief, Dunlap argues that the Social Security Commissioner could only be removed for neglect of duty or malfeasance of office, which is a higher standard for removal than the statutes at issue in *Seila Law* and *Collins*.  Doc. No. 19, p. 3 (citing 42 USC § 902(a)(3)).  Thus, Dunlap claims, "the issue in this matter was even more unconstitutional."  Doc. No. 19, p. 3.  But he cites no legal authority indicating that the compensable harm requirement in *Collins* is meant to be applied on a sliding scale depending on the removal language in the relevant statute.  He argues that while Saul was Commissioner "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and in DI 34121.013 and DI 34121.015, which modified the way musculoskeletal impairments are evaluated.  Doc. No. 19, p. 4.  But HALLEX 1-2-3-20, "Acknowledgment of Notice of Hearing," sets forth ways in which the Agency communicates to

claimants that it received their notice of hearing forms; it does not modify the way the ALJs write their decisions.[5]  Dunlap does not claim that he suffered any harm as a result of his request for a hearing and his receipt of the Agency's notice scheduling one.  And POMS DI 34121.013 and 34121.015 became effective in April 2021 and did not impact Dunlap's 2018 application or 2020 hearing and decision.[6]

Finally, Dunlap complains that Defendant downplayed the effect the Commissioner has on the disability adjudication process, an effect "publicly stated by President Biden and the White House when the President finally terminated Mr. Saul as Commissioner."  Doc. No. 19, p. 5.  Dunlap does not identify the public remark made by the President, the date it was made, the date Saul was removed as Commissioner, or explain how his disability application was impacted as a result.  Thus, he has not shown the type of compensable harm stemming from the unconstitutional removal provision that was described in *Collins*.  The undersigned find that Dunlap's constitutional challenge fails.

**B. The ALJ's step three findings are supported by substantial evidence**

Dunlap argues that the ALJ erred at step three.  At step three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin*., 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs*., 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of

---

[5] *See* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 1/28/22).  Dunlap does not provide a link to the Hallex provision that he states came into effect in July 2019.

[6] *See* https://secure.ssa.gov/poms.nsf/lnx/0434121013; https://secure.ssa.gov/poms.nsf/lnx/0434121015 (last visited 1/28/22).

that listing" and a claimant "must satisfy all the criteria to meet the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Here, the ALJ considered Dunlap's knee and shoulder impairments under Listing 1.02, Major dysfunction of a joint(s) (due to any cause); his asthma under Listing 3.03, Asthma; and his neuropathy under Listing 11.14, Peripheral neuropathy.[7]  Tr. 18-19.  Dunlap argues that the ALJ erred because he did not discuss Listing 1.03.  Doc. No. 15, p. 13.  Listing 1.03 is "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Even if it could be said that Dunlap had reconstructive knee surgery such that Listing 1.03 applies to him, he does not show that he satisfies that listing.  When the ALJ considered Listing 1.02, which also requires an inability to ambulate, the ALJ found that Dunlap can ambulate effectively under the criteria of 1.00B2b, a finding that Dunlap does not challenge.  Tr. 18.

> Section 1.00B2b states,
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b.  Dunlap does not dispute that he did not use an assistive device to ambulate.  At the hearing, he stated that he could walk for 10-20 minutes and walked from the parking garage to the hearing; he went shopping; and he traversed the stairs in his two-story home at least twice a day.  Thus, he has not shown that he has an inability to ambulate, and any error on the part

---

[7] The listings cited by the ALJ and in this opinion are from the version that was in effect at the time of the ALJ's decision, March 2020.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective February 24, 2020 to May 20, 2020).

of the ALJ for failing to consider Listing 1.03 is harmless because Dunlap has not shown that he can satisfy the requirements of Listing 1.03. *Thacker*, 93 Fed. App'x at 727-728 (a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

Dunlap also argues that the ALJ erred when considering whether his mental impairments satisfied a listing. The ALJ considered Listing 12.04, Depressive, bipolar and related disorders, and 12.06, Anxiety and obsessive-compulsive disorders. Tr. 19. Both listings require the ALJ to consider whether the "paragraph B" criteria are satisfied, *i.e.*, the claimant's mental impairments must result in at least one "extreme" limitation or two "marked" limitations in four areas of functioning. 20 C.F.R. Part 404, Subpt. P, Listing 12.00A(2)(b). The ALJ found that that Dunlap did not satisfy the paragraph B criteria because he had a "mild" limitation in understanding, remembering, or applying information and interacting with others and a "moderate" limitation in his ability to concentrate, persist, or maintain pace and to adapt or manage himself. Tr. 19-20. In support of his findings the ALJ cited activities that Dunlap performed, and Dunlap contends that the ALJ "incorrectly stated" those activities. Doc. No. 15, p. 19.

The ALJ listed the following activities that Dunlap performed in his paragraph B discussion: he could perform simple maintenance, prepare meals, pay bills, manage funds, go to doctor's appointments, handle his own medical care, take medications, shop, drive, read, watch TV, play games, use the internet, get along with others, spend time with friends and family, live with others, deal appropriately with authority, handle self-care and personal hygiene, care for pets, and care for children. Tr. 19-20. Dunlap argues that he and his girlfriend had indicated in a function report that Dunlap "was unable to pay bills" (Doc. No. 15, p. 18), but both had written that that answer was relevant to his financial situation because his family paid his bills, not because he was mentally unable to pay bills. Tr. 264-265,

21

308.  Both indicated that Dunlap could handle a savings account, use a checkbook, and count change.  Tr. 264.  Thus, the ALJ's statement that Dunlap could pay bills is accurate.  Dunlap argues that his girlfriend had written that he could no longer cook homemade meals because he could not stand for long (Doc. No. 15, p. 18, Tr. 307), but that does not describe a mental impairment that prevented him from cooking.  Dunlap and his girlfriend had stated that Dunlap could prepare his own meals (Tr. 263, 307); the ALJ's statement that Dunlap could prepare meals is accurate.  So, too, with respect to Dunlap's allegations regarding his difficulties with self-care (Doc, No. 15, p. 19, Tr. 262); he described difficulty due to physical problems, not because of his mental impairment.  Moreover, the ALJ also cited objective exam findings in support of his analysis of all four paragraph B criteria, including the fact that Dunlap presented at his appointments with appropriate grooming and hygiene, which Dunlap does not challenge.

Next, Dunlap argues that, even if he could perform the activities cited by the ALJ, "the ability to perform some activities on a limited basis is not substantial evidence that a claimant's symptoms were not disabling."  Doc. No. 15, p. 19 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp.3d 829, 838 (S.D. Ohio 2015)).  But in *Lorman* the court found that the plaintiff's ability to perform household duties was not substantial evidence to support the ALJ's finding that the plaintiff could perform substantial gainful activity.  *Id.  Lorman* did not address the ability to perform activities in the context of whether a claimant satisfies a listing at step three.  Dunlap complains that the ALJ "relied on information not relevant" in his paragraph B analysis but does not identify what information the ALJ relied upon that was irrelevant; that argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to…put flesh on its bones.") (citation omitted).  He cites a number

22

of cases in which a court remanded a case when the ALJ committed an error at step three but does not

show how those cases are on point with this one.  Doc. No. 15, p. 20.  He argues that an ALJ must do

more at step three than utter a "perfunctory statement" (Doc. No. 15, p. 21) and cites *Illitch v. Comm'r*

*of Soc. Sec.*, 2019 WL 1324050, at *9 (S.D. Ohio Mar. 25, 2019), in support.  In *Illitch*, the court

reversed at step three because the ALJ "did not perform any analysis at step three and did not identify

the evidence on which he relied in determining plaintiff's impairments did not meet or equal the severity

of" the relevant listing.  *Id*.  Here, in contrast, the ALJ performed an analysis at step three and identified

the evidence upon which he relied.  Tr. 19-20.

     Dunlap cites evidence in the record that he believes supports a finding that he satisfies the

paragraph B criteria.  Doc. No. 15, pp. 16-17; Doc. No. 19, p. 1.  But the ALJ considered, and

discounted, that evidence.  Dunlap cites the opinion of Dr. Weinstein, whom he saw in connection with

his worker's compensation claim, but the ALJ did not find Dr. Weinstein's opinion persuasive because it

was temporary in nature and based on a different standard (Tr. 25), a finding that Dunlap does not

challenge.  Dunlap relies on the opinion of Dr. Krabbe, a consultative examiner, but the ALJ discounted

Dr. Krabbe's opinion because it was "overly reliant on [Dunlap's] subjective self-reporting" (Tr. 24-25),

a statement that is accurate and which Dunlap does not challenge.  He relies on the opinion of

consultative examiner Dr. Benson-Blankenship, but Dr. Benson-Blankenship did not find that Dunlap

had more than "moderate" limitations in any of the four areas of functioning covered by the paragraph B

criteria, whereas Dunlap needs to show that he has more severe limitations ("marked" or "extreme") to

satisfy the paragraph B criteria.  Thus, Dr. Benson-Blankenship's opinion does not support Dunlap's

argument that he satisfies the paragraph B criteria.  Finally, Dunlap argues that the ALJ did not consider

his pain when determining his ability to concentrate, persist and maintain pace.  Doc. No. 15, p. 22.  But

Dunlap has not identified evidence in the record supporting his assertion that pain caused him more than

moderate limitations in that domain, as the ALJ found.  While Dunlap disagrees with the ALJ's

conclusions, he has not shown that the ALJ erred at step three or that his findings are unsupported by

substantial evidence.

**C. The ALJ did not err with respect to Dunlap's obesity**

Dunlap asserts that there is a correlation between obesity and diabetes and that, according to SSR

14-2p, a person with diabetes mellitus and obesity "may have more severe complications than the

effects of each of the impairments considered separately."  Doc. No. 15, p. 14.  He complains that the

ALJ stated that he considered Dunlap's obesity "but made no further analysis at Step Three beyond a

brief statement that he considered how Dunlap's obesity may cause fatigue that would affect his ability

to function physically."  Doc. No. 15, pp. 14.

At step three, the ALJ wrote,

In reaching the conclusion that the claimant's impairments do not rise to listing level, I also
considered the effect that the claimant's obesity has on the other impairments and on the
claimant's ability to perform routine movement and necessary physical activity within the work
environment. I also considered how the claimant's obesity may cause fatigue that would affect
the ability to function physically pursuant to Social Security Ruling 02-1p. Because the physical
examinations contained in the record were mostly unremarkable, I do not find that the claimant's
obesity, either singularly or in combination with the claimant's other medically determinable
severe impairments, results in limitations greater than those assessed in this opinion.

Tr. 19.  The ALJ did not only reference fatigue, he also referenced Dunlap's ability to perform routine

movements and physical activity, both relevant to the effects of Dunlap's obesity in combination with

his other impairments.  *See also* SSR 19-2p, "Evaluating Cases Involving Obesity," 2019 WL 2374244,

at *4 (May 20, 2019).[8]

Dunlap complains that the ALJ cited SSR 02-1p, which describes how obesity is evaluated, but

that he should have cited SSR 14-2p, "Evaluating Diabetes Mellitus," which states that a person with

---

[8] SSR 19-2p, which went into effect on May 20, 2019, replaced SSR 02-1p, "Evaluation of Obesity," 2002 WL 34686281
(Sept. 12, 2002).  Although Dunlap complains that the ALJ cited the older version, SSR 02-1p, he does not describe a
substantive error by the ALJ.

diabetes and obesity "may have more severe complications than the effects of each of the impairments considered separately." Doc. No. 15, p. 14 (citing SSR 14-2p, 2014 WL 2472008 at *5). The ALJ considered Dunlap's diabetes when evaluating his neuropathy under Listing 11.04, as SSR 14-2p instructs. *See* 2014 WL 2472008 at *6 (describing the listings an ALJ considers at step 3, including diabetic neuropathy under the 11.00 listings). Dunlap does not describe any additional symptoms caused by his diabetes that the ALJ should have evaluated. Indeed, the record shows that, early on, Dunlap's diabetes was controlled and he was able to stop taking his medications to treat it, as the ALJ observed. The ALJ wrote that Dunlap had changed his diet, increased his physical activity, lost weight, and was able to stop taking diabetic medication. Tr. 22. The ALJ concluded,

> Although the claimant suffers from obesity, there is no medical evidence that it imposes any mobility or functional limitations beyond those set forth above and incorporated into the residual functional capacity assessed herein. In accordance with SSR 02- 1p, I have considered the impact of the claimant's obesity on the severe impairments identified above. No treating or examining physician has indicated that the claimant's obesity has any significant exacerbating effect on h[is] other impairments.

Tr. 22.

The undersigned finds that Dunlap has not shown that the ALJ erred when evaluating his obesity.

## D. The ALJ's RFC assessment is supported by substantial evidence

Dunlap argues that the ALJ "failed to address the fact that after his surgeries, Dunlap needed to wear knee braces." Doc. No. 15, p. 22 (citing Tr. 773, a treatment note from October 2019 in which Dunlap was wearing bilateral knee braces). He does not explain how his wearing knee braces had an effect on his ability to perform sedentary work with occasional postural limitations.

Dunlap submits that the ALJ's evaluation of his allegations of symptoms was nothing more than "the boilerplate paragraph finding that Dunlap's symptoms were not entirely consistent with the medical evidence." Doc. No. 15, pp. 22-23, 25. But the ALJ further explained that Dunlap's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent because the records did

25

not support a finding that Dunlap had limitations with sitting, which is consistent with sedentary

exertion. Tr. 21. The ALJ detailed the evidence of record: Dunlap's remote knee surgeries in 2014, his

right knee surgery in 2017 and his improvement, including the fact that a provider assessed his knee and

range of motion as "really good." Tr. 21, 405. In mid-2018 he later described moderate knee pain to his

chiropractor, worsened with prolonged standing, walking, climbing stairs and pivoting, and he was

encouraged to remain active. Tr. 21, 959-960. He fractured his foot in 2019 and injured his left knee in

September 2019 and had left quadriceps tendon surgery to repair it in October 2019. Tr. 22.

Meanwhile, he had been doing home exercises three times a week, using a recumbent bike, and

experienced some improvement with a right knee injection. Tr. 22, 813. At post-surgical visit eleven

weeks after surgery, his left knee flexibility had improved and he was to continue physical therapy. Tr.

22. At that visit, he ambulated without an assistive device with a slight limp, rated his pain 6/10, had

mild tenderness in his left knee and mild to moderate swelling in his joint. Tr. 834. In other words,

Dunlap had improved after his right knee surgery in 2017 and showed improvement after his left knee

surgery in 2019; that evidence supports the ALJ's conclusion that his statement's regarding his inability

to perform sedentary work are not persuasive. With respect to his mental impairments, the ALJ

explained Dunlap's treatment history; his changes in medication and his reported improvements with

medication and counseling, and, finally, his six-month gap in treatment, during which time he had

stopped taking his medication. Tr. 23-24. Nevertheless, the ALJ stated that his mental exam findings

that day were normal. Tr. 23-24. *See* SSR 16-3p, 2017 WL 5180304, *7-8 (when evaluating an

individual's allegations of symptoms, the ALJ considers the claimant's treatment, citing 20 C.F.R. §

404.1529(c)).

The ALJ also considered the opinion evidence. *See id*. at *5-8 (an ALJ considers the claimant's

complaints along with the objective medical evidence and information from medical and non-medical

sources).  The ALJ explained that he provided greater limitations than the state agency reviewers, who had opined that Dunlap could perform light work, by limiting Dunlap to sedentary work based on the hearing testimony.  Tr. 24.  The ALJ stated that the opinion of Dunlap's chiropractor, Dr. Pinghero, dated February 27, 2020—that Dunlap could sit for less than 2 hours a day, could never lift or carry, was incapable of low stress work, and had no work capabilities—was unpersuasive because it was not from an accepted medical source and was "not even remotely consistent with or supported by the objective medical records."  Tr. 24.  Dunlap complains that the ALJ rejected Dr. Pinghero's opinion "without noting similar restrictions from Spectrum Orthopedics" assessed on October 1, 2019, which, Dunlap asserts, support Dr. Pinghero's opinion.  Doc. No. 15, p. 24.  But the restrictions that Spectrum Orthopedics placed on Dunlap on October 1, 2019 (no squatting, lunging, kneeling, twisting, and limited stairs) were due to his left knee injury, which, at that time, was a 3-day old, as-yet-undiagnosed left quadriceps tear for which he underwent surgery on October 23, 2019.  As the ALJ found, Dunlap improved after surgery; he walked without an assistive device, had improved flexibility, and continued physical therapy.  Tr. 22.  Thus, the temporary, severe restrictions placed on Dunlap at the time of his left knee injury and immediately following surgery do not bolster the opinion of Dr. Pinghero issued four months later stating that Dunlap could not sit for 2 hours a day, could never lift or carry any weight, and had no work capabilities.

Next, Dunlap challenges the ALJ's treatment of the opinion of consultative examiner Dr. Benson-Blankenship.  Doc. No. 15, p. 24.  The ALJ described Dr. Benson-Blankenship's assessment of Dunlap as having moderate limitations in activities of daily living, social functioning, concentration, persistence, and pace, and adaptation.  Tr. 25.  Dunlap complains that the ALJ "failed to state that she found that Dunlap had poor coping due to his anxiety and depression, his pace of activity had slowed, he had a l[a]ck of concentration, socially isolated, and had poor capacity to deal with feelings of loss," etc.

Doc. No. 15, p. 24. Nevertheless, despite Dr. Benson-Blankenship's description of Dunlap's functioning, she still found that he had moderate (not "marked" or "extreme") limitations in the four areas of functioning, as the ALJ noted. Tr. 25, 665. The ALJ was not required to recite every aspect of Dr. Benson-Blankenship's opinion. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 508 (6th Cir. 2006) (an ALJ need not recite every piece of evidence submitted by a party).

In his reply brief, Dunlap argues, for the first time, that the ALJ erred when he failed to include a limitation assessed by the state agency reviewers in his RFC—that Dunlap "may benefit from a supervisor to offer occasional redirection." Doc. No. 19, p. 2. The Court is not required to address that argument because it was raised for the first time in a reply brief.[9] *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (an issue raised for the first time in a reply brief is waived). In any event, the ALJ explained why he did not include the limitation that Dunlap "may benefit" from occasional redirection in his RFC; it was indefinite and not supported by record. Tr. 24. The ALJ's characterization of that limitation as indefinite was accurate. Moreover, an ALJ is not required to adopt a medical opinion verbatim in the RFC finding. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).

Dunlap's remaining arguments are without merit. He submits that the ALJ erred when he found that the opinion of Dunlap's girlfriend was not persuasive, Doc. No. 15, p. 25, but he does not develop that argument. Therefore, he has waived it. *McPherson*, 125 F.3d at 995–996. His bald assertion that the ALJ "failed to provide a coherent explanation or identify any contemporaneous evidence to support his RFC" and "failed to provide sufficient information so this Court can facilitate meaningful judicial review" is also unavailing; the ALJ spent almost five pages detailing the evidence in support of his RFC and provided sufficient information enabling the Court to facilitate meaningful judicial review.

---

[9] In his reply brief, Dunlap presents this argument as if he is challenging the Defendant's failure to defend the state agency reviewers' opinions in its brief. Doc. No. 19, p. 2. But it is the plaintiff's duty to present challenges to the ALJ's decision, not the defendant's duty to raise all conceivable challenges and defend them.

In sum, the undesigned finds that the ALJ's decision is supported by substantial evidence and must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (the ALJ's decision must be affirmed so long as substantial evidence supports the conclusion reached by the ALJ).

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: January 28, 2022                    *s/ Jonathan Greenberg*
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**